IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| **CHARLES CASEY** : | |
| And | |
| **JEANNETTE CASEY,** : | |
| Plaintiffs : | |
| : | |
| Vs. | Civil No.: PWG-10-cv-2268 |
| : | |
| **GEEK SQUAD®** : | |
| *Subsidiary* | |
| **BEST BUY STORES, L.P.,** : | |
| Defendant : | |

: : : : : : : : : : : : :

### PLAINTIFFS' RESPONSE TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiffs Charles Casey and Jeannette Casey, by and through their attorneys, Sandra B. Minton, Robert K. Nead, and Nead, Minton and Ferris, LLP, and pursuant to Federal Rule of Civil Procedure 56, respond as follows to Defendant's Motion for Summary Judgment.

### Statement of Additional Facts

On or about September 8, 2007, Plaintiff Charles Casey took his computer to Defendant's Timonium, Maryland, store for service by the Geek Squad, noting at the time that his computer showed evidence of a virus.  The unidentified individual accepting the computer for service and repair confirmed that there was indeed a computer virus that required removal and that the Geek Squad could remove the virus within ten

1

days. (Deposition of Charles Casey, December 30, 2010, attached as Exhibit A, p. 32, lines 8 – 19.) The technician accepted the computer for service on September 8, 2007. The Service Order noted "Symptoms" as "unit has serious sign ov [sic] provided by Defendant, attached as Exhibit B; Service Order presented to Plaintiff, attached as Exhibit C.) The Service Order maintained by the Geek Squad (Exhibit B) also indicates that Geek Squad was authorized to "perform the services requested" and to "repair all apparent defects identified by Best Buy…." The expected date of completion was 9/11/2007. At the time the computer was accepted for service and repair by an unidentified technician, Plaintiff Casey was charged $199 for "Diagnostic and Repair" and $99.00 for "One Tim Backup/Transfer." (Sales Receipt attached as Exhibit D; Customer Sales History attached as Exhibit E.) Defendant's Corporate Designee, Dave Tkach, confirmed that the charges were paid in advance. (Deposition of Dave Tkach, May 12, 2011, attached as Exhibit F, p. 37, line 4 – p. 38, line 12,.) While in the possession and control of the Geek Squad for over 40 days, the virus was apparently removed from the computer and the computer was disassembled. (Service Order provided to Plaintiff at the time the computer was picked up, attached as Exhibit G.) According to Exhibit G, the services performed by the Geek Squad also included installation of an operating system, cleaning out temporary files, and defragmenting and scanning the disk. There is no explanation of the purpose for disassembling the Casey computer.

When the computer was provided for Mr. Casey's pickup, the Plaintiff was advised that the Geek Squad technicians had been unable to put the computer hardware back into its tower/cabinet, as one of the computer components no longer fit inside of the

computer cabinet.    At the time, The Geek Squad represented the need to replace the old CD drive with a new drive so that all of the parts would again fit into the cabinet.  The original CD drive was replaced while Mr. Casey waited.  He was charged $78.74 for this new part. (Exhibit A, p. 32, line 20 – p. 33, line 13; Credit Card receipt for purchase, attached as Exhibit H; Exhibit E.)

Once back home, Plaintiff, placed the computer in the same spot as it had occupied before being taken to Best Buy for repair.  Nothing had been moved between the removal of the computer in September until it "came home" in October.   There was no report of any electrical surge within the house during that same time period.   Nothing was changed. (Exhibit A, p. 35, line 13 – 37, line 22; Plaintiff Charles Casey's Answers to Interrogatories, attached as Exhibit I, Answer  No. 6.)

At the time Plaintiff Casey realized the printer was not plugged into the computer, he stabilized the computer by placing his left hand on the front of the computer and the computer desk and was attempting to lean around the computer and desk to locate the printer cable, which would have then been plugged into computer, when he was electrocuted. He had nothing in his hand and was not attempting to plug anything into the computer. Plaintiff's right hand was behind the computer tower.  (Exhibit A, p. 36, line 36 – p. 37, line 22.)

## ARGUMENT
### *Negligence*

Pursuant to F.R.C.P. 56, a party may be entitled to Summary Judgment if it is clear there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law.  Defendant has asserted its entitlement to judgment in this case on the issue of lack of negligence.

Generally, negligence is a failure to exercise the care that a reasonably prudent individual would exercise in similar circumstances.  Specifically, in Maryland, in order to succeed on a claim of negligence, a claimant must show a duty of care, a breach of that duty, actual injury or loss, and a causal relationship between the injury and the breach. *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 642 A.2d 180 (1994).   In addition,

> This duty of care owed to another requires an actor to conform to a certain standard of conduct so as to protect the other from unreasonable risk of harm. *Lamb v. Hopkins*, 303 Md. 236, 241, 492 A.2d 1297 (1985).

**Breach of Duty**

Defendant, in his argument, does not claim that the Geek Squad of Best Buys had no duty but rather attempts to assert that there was no breach of a duty.  (Defendant's Motion for Summary Judgment, p. 5, paragraph 2—"First, Plaintiffs herein have offered no evidence with regard to the breach of any duty owed by Defendant in performing repairs upon the subject computer," citing *Johnson v. County Arena, Inc*., 29 Md.app. 674, 349 A.2d 643, 646 (1976)).

At all relevant times, the Geek Squad was engaged in the business of computer analysis, maintenance, and repair and other computer-related services and its technicians should have been acting as trained computer personnel.  According to Defendant's corporate designee, as a supervisor of the Geek Squad, he would have made sure computers brought in for repair were "repaired properly" and that technicians would "know how to remove anti-virus."  (Exhibit F, p. 8, lines 7 – 18; p. 11, line 14 – p. 12, line 10.)

It is clear that the relationship of the parties and the work being completed by Defendant establishes a duty on the part of Defendant to protect Plaintiff from an

4

unreasonable risk of harm.  (See *Lamb v. Hopkins,* previously cited.)  It was foreseeable that an action or a failure of action by Defendant could result in harm to Plaintiff, as computers are electrically wired.  An individual who is not versed in computer repairs of necessity relies on the representation of individuals or entities who hold themselves out as "experts" in the field.

      Plaintiff suspected a computer virus based on a picture on the computer screen; Defendant confirmed the existence of the virus, using a Best Buy analyzer.  Plaintiff asked Defendant to remove the virus from his computer.   Defendant agreed to remove the virus, which he was presumably trained to do.   Plaintiff was charged with the service of removing the existing virus before he left the store.

      In an attempt to defeat Plaintiff's claim of Defendant's breach for improper service and harmful repairs, Defendant alleges that there is no evidence of any services performed on the computer other than removal of the virus and installation of a new CD drive.  (Defendant's Memorandum, p. 5, paragraph 2.)  Plaintiff vehemently disputes this allegation.  The evidence presented here is clear that, in addition to removing the malicious virus, Defendant opened the Casey computer—<u>disassembled</u> the computer**,** according to Defendant's Service Order, and without authority or necessity—and somehow managed to rearrange the component parts such that they would not all fit back into their original, safe and secure and intended locations.  Defendant's technician admitted that something was wrong when he advised the Plaintiff that the computer parts would not fit.  Defendant had to know at that time that some action or inaction had caused the mal-fit, but offered no explanation.  That was a breach of Defendant's duty to correctly repair the Casey computer and to protect Plaintiff from possible harm when

Plaintiff would next use the computer. Defendant has continued to fail to provide an explanation for this colossal breach.

Two questions arise from Defendant's actions. First, why was the computer disassembled? Defendant's corporate designee testified as follows:

> **Q.     Tell me how a virus is normally removed?**
>
> A.     So we plug in the Ethernet cable into the computer and it goes to our third-party site, where they run numerous different types of software to find, A, the virus, and then, B, remove it from the system.
>
> **Q.     It's done all by software?**
>
> A.     Yes.
>
> **Q.     There's been testimony that when Mr. Casey picked up the computer, whoever had worked with it at any time, said that he could not get it shut because there was a – the CD drive would not allow the case to be put back on. If software is what identifies viruses and corrects them, why would the computer have been dismantled?**
>
> A.     I do not know.

(Exhibit F, p. 39, line 20 – p. 40, line 15.)  See also Defendant's Answers to Interrogatories, Attached as Exhibit J, Answer No. 5)

Defendant's named expert, Christoph J. Flaherty, P.E., testified similarly:

> Q.     What do you know about repairs which may have been done to the computer that was taken into best Buy for Repair? What repairs were made?
>
> **A.     Based on Doctor Casey's testimony and the service records provided by Best Buy, and on Mr. Pkach's testimony, Doctor Casey took the computer to Best Buy because he was having some problems operating it.**
>
> **     And they did some analysis on it and determined that it had been infected with a virus. And they performed some virus removal. And I think there was also some notation about having to replace a CD drive.**
>
> Q.     Based on your own personal investigation and personal experience, would you have any opinion as to why there needed to be a replaced drive in the computer?
>
>          MR. DUNN:  Objection to the form.
>
> A.     No, I do not.

BY MS. MINTON:

6

>    Q.     In your own personal experience and personal research, have you ever known that a virus could precipitate the need to replace any drive in the computer?
>
>    **A.     They commonly do not.  The only instances that I could think of is viruses that may affect the computer's hard drive, and that might necessitate a replacement of the hard drive.**
>
>    Q.     But that's not what you understand was replaced, correct?
>
>    **A.     That's right.**

(Deposition of Christoph J. Flaherty, June 20, 2011, attached as Exhibit K, p. 21, line 20 – p. 23, line 5.)

And, Plaintiff's named expert, Clark Riley, also testified concerning the lack of explanation concerning the disassembly of the Casey computer.

>    Q.     Do you have any reason to believe this was not properly grounded?
>
>    **A.     That's part of the problem.  The – as it's designed, as it's out of the box and engineered, they are properly grounded.  This particular one, from the descriptions give by the work order, it was disassembled and the technician had problems reassembly it.  Why that would be is a question.  And that – that leaves that question open.**
>
>    Q.     Okay.
>
>    **A.     And that's actually the problem.**
>
>    …
>
>    **A.     And the matter of the documentation has to do with their having opened the computer in the first place.  The complaint when the computer was taken was in, was for a virus.  That doesn't call for opening the computer.**
>
>    Q.     Well, you understand that when they took it in, they also couldn't get a drive to work and Mr. Casey wanted it replace while they had it.
>
>> MS. MINTON:   That's not what the testimony is.  I'm going to object. However, if you want to rephrase.
>
> BY MR. DUNN:
>
>    Q.     Is it your understanding that there was additional problems?
>
>    **A.     I was – I had seen nothing that indicated that there was any hardware problem.  If – if there was, it was not documented.**

(Deposition of Clark Riley, Ph.D., March 18, 2011, attached as Exhibit L, p. 22, line 20 – p. 23, line 8; p. 28, line 11 – p. 29, line 5).

7

Defendants had no need and no authority to disassemble the Casey computer. And yet, the evidence clearly shows that this occurred. The standard of care for Defendant was enhanced—went beyond the usual standard of ordinary care—as Defendant's technicians knew, or should have known, how to repair and maintain computers, which the Plaintiff did not. (Exhibit I, Answer Nos. 9 and 10.) The care owed to the Plaintiff by Defendant was something superior to that which would constitute ordinary care, as alleged by the Defendant. (*See Johnson v. County Arena, Inc*., 29 Md.App.674, 349 A.2d 643 at 678 (1976).

A second question, then, is why were the computer experts, or at least those with alleged advanced or superior computer knowledge, known as The Geek Squad, unable to put the computer back to its original condition, minus the virus? There is no evidence of what took place or what might have gone wrong. And there is clearly something wrong when the original computer parts don't fit, necessitating the purchase, at the owner's expense, of a new drive. Without an explanation, there is no way of knowing what was going on inside the computer, but one could readily infer, with nothing more, that something was wrong. The Geek Squad has offered no explanation through testimony or documentation of what was done to the computer, why the computer was dismantled, why it was necessary to replace a CD drive that had previously worked and fit in the cabinet/tower.

Defendant further argues that it did not breach any standard of care because the computer worked for two hours before Plaintiff was electrocuted. (Plaintiff's Memorandum, p. 7, paragraph 1.)  This is in reference to Plaintiff's successful use of a keyboard before placing one hand on the computer to steady it and looking for a cable to

plug into the computer.  Negligence is not limited to an exact time period but rather has to do with intervening causes.  Sitting in front of a keyboard and working on a computer is not the same thing as physically holding onto one part of the computer while coming into contact with still another part of the computer.  Plaintiff did nothing to intervene in the process conducted by Defendant while the computer was in possession and control of Defendant.  Plaintiff asserts that there was no intervening cause, nothing to interfere with whatever repairs Defendant had made.

To prevail on a negligence claim, Plaintiff must establish by a preponderance of the evidence that the Defendant's actions were unreasonable and that such actions caused the injuries to the defendant.  While here there may be no direct evidence of Defendant's negligence, because there is no documentation of Defendant's actions and no identified participants to explain these actions, there is an inference of that negligence, based on all of the evidence presented.

There is sufficient evidence for a jury to infer Defendant's negligence and thus Plaintiff is entitled to present its case to a jury based on the inference of negligence.

### Res Ipsa Loquitur

Negligence can also be shown through circumstantial evidence, one form of which is *res ipsa loquitur.*  The Maryland Court of Appeals, in *Dover Elevator Company v. David Swann*, 334 Md. 231, 638 A.2d 762 (1993), at 765 (citations omitted), has established that the following elements are necessary to support a *res ipsa loquitur* claim:

1. A casualty of a sort which usually does not occur in the absence of negligence.
2. Caused by an instrumentality within the defendant's exclusive control.

    3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff.

"The doctrine [of res ipsa loquitur] merely provides a permissible inference of negligence. This means that the inference of negligence to be drawn from the circumstances is left to the jury…. As for the plaintiff, the doctrine furnishes sufficient evidence to go to the trier of fact." *Meda v. Brown*, 318 Md. 418, 424, 569 A.2d 202, 205 (1990).

In the present case, Plaintiff's computer expert has testified that "a properly grounded computer is designed to prevent electric shocks." (Exhibit K, p. 22, line 17 – p. 23, line 22.). Dr. Riley further testified that "there was a pathway of current between the computer and Dr. Casey" that had not previously existed before the computer was taken to Defendant for repair. (Exhibit K, p. 27, line 17 – p. 28, line 9.) During Dr. Clark's 40 years of computer experience, he has not seen a computer shock such as sustained by Dr. Casey. (Exhibit K, p. 34, lines 3 – 19.) Together these facts sets forth a "casualty…which usually does not occur in the absence of negligence," that was caused while in Defendant's exclusive control. Based on this case's circumstantial evidence there is an inference of Defendant's negligence that should warrant taking the case to a jury.

Plaintiff does not have to exclude every possible cause for his injury other than defendant's negligence but must show a greater likelihood that his injuries were caused by defendant's negligence than by another cause. *Leikach v. Royal Crown Bottling Co.*, 261 Md. 541, 276 A.2d 81 (1971). No other cause for Plaintiff's injuries has been presented.

Plaintiff is entitled to present his case to a jury based on circumstantial evidence under res ipsa loquitur.

**Causation**

In addition to arguing that Plaintiff cannot support a claim of negligence because Defendant did not breach its duty, Defendant has also alleged that Plaintiff will not be able to show causation, citing *Sindler v. Litman*, 166 Md. App. 90, 887 A.2d 97 (2005) to explain proximate causation.  Defendant continues to assert that no services were performed on the Casey computer other than the removal of a virus and installation of a new CD drive and that Plaintiff had no problem with these services.  Defendant omits knowledge of its technicians disassembling the computer and being unable to fit the parts back together, despite testimony from its own designee.  Plaintiff argues above that there is an i*nference* that Defendant technicians were negligent in their service of the Casey computer and that the Defendant's inferred negligence was the cause of Defendant's injuries.   In addition, the technicians knew that whatever had been done incorrectly or improperly inside the computer *could* result in some danger to whoever used the computer in the future—foreseeable harm could result—as the computer had not been put back together properly.

Defendant has set forth a disputed and known incorrect fact in arguing that Plaintiff plugged "in the printer to the computer, which immediately precipitated his injury," constituting a "superseding cause." (Defendant's Memorandum, p. 9, paragraph 1.)  There is neither testimony nor any evidence that Plaintiff plugged in a printer to his computer, despite Defendant's continuing argument.  The testimony from Dr. Casey is rather that he was shocked with one hand on the front of his computer and desk and the

11

other hand behind the computer tower while trying to locate the printer cable.  There is no evidence that Plaintiff ever touched the printer or a cable connected to the printer. (Exhibit A, p. 36, line 36 – p. 37, line 22.)  There is no intervening cause between Defendant's control of the computer and the electrical charge experienced by the Plaintiff.  *See also Peterson v. Underwood*, 258 Md. 9, 264 A.2d 851 (1970), which provides for an inference or presumption both of negligence and of proximate causation.

### **Plaintiff Expert**

In order to present a claim based on circumstantial evidence (*res ipsa loquitur*) a plaintiff cannot rely on an expert to support an inference of negligence and thus Plaintiff Casey would not rely on Dr. Riley to provide any such evidence to establish causation under a res ipsa loquitur claim.  (See *Dover Elevator Company v. David Swann*, 334 Md. 231, 262, 638 A.2d 762, 777 (1994), which Defendant incorrectly notes as an authority for expert testimony in a *res ipsa* case.).  *See also Meda v. Brown*, 318 Md. 418, 424, 569 A.2d 202, 205 (1990).   "Res ipsa loquitur, as we now utilize that concept in the law of negligence, means that in an appropriate case the jury will be permitted to infer negligence on the part of a defendant from a showing of facts surrounding the happening of the injury, *unaided by expert testimony*, even though those facts do not show the mechanism of the injury or the precise manner in which the defendant was negligent" a*t* 425, 205, *emphasis added*.  *Tucker v. University Specialty Hospital*,166 Md. App. 50, 887 A.2d 74 (2005)(res ipsa loquitur in Maryland is not available in cases requiring expert testimony, p. 79, and in traditional res ipsa loquitur cases, juries are permitted to infer negligence unaided by expert testimony, p. 83.)

However, under *Meda v. Brown*, in a non-res ipsa claim, an expert may use an inferential reasoning process, based on his or her knowledge of the facts and expertise, to show that a particular injury would not have occurred absent negligence. A jury can then infer that there was negligence based on the expert's testimony. 318 Md. 418, 425, 569 A.2d 202, 205. In this circumstance, Plaintiff's expert could then testify as to the causal relationship between Defendant's negligent repairs and the injury sustained by Plaintiff, as he has previously done. (Exhibit A, p. 29, line 14 – p. 32, line 22; p. 22, line 17 – p. 21, line 22; p. 28, line 4 – p. 29, line 21).

### **Contributory Negligence**

Defendant continues to argue that Plaintiff was plugging in his computer at the time of his electrocution. As stated before, and as is clear through Plaintiff's testimony, at the time Plaintiff was electrocuted his left hand was braced against the desk and bottom of the computer and he was attempting to locate the printer cable in order to plug it in. Plaintiff had nothing in his hand and had not touched the printer or its cable at the time of the electrical shock. His hand was behind the computer tower—not on the printer or the printer cable.

As importantly, though, Plaintiff would have had no expectation of being shocked in the manner in which he experienced the electrical shock. He had received no previous shock of this kind and had done nothing to cause such a shock—except to bring the computer home and plug it in. He was not touching an outlet and would not have known that the computer tower had been improperly repaired. Plaintiff's act was neither negligent nor unreasonable under the circumstances. It would be expected that a person of ordinary prudence would do the same without some expectation of harm. Thus

Defendant cannot support a claim of contributory negligence, or even a superseding cause.

### *Breach of Warranty*

Plaintiff's claim for "Breach of Warranty of Fitness for Use" is better titled as a claim for Breach of Contract. At common law, a contract is between two or more parties. When a contract is made, the parties exchange promises that are legally enforceable. Plaintiff and Defendant entered into a contract for services. Plaintiff agreed to pay a specified amount; Defendant agreed to remove a virus from Plaintiff's computer and to provide a working computer after the removal. Plaintiff paid the agreed upon amount, as has been set forth in the Statement of Additional Facts. Defendant breached that contract when it returned a defective computer to Plaintiff, which defect caused Plaintiff to sustain an electrical shock that resulted in extensive personal injuries.

Contrary to Defendant's assertions, a causal connection between Defendant's negligence in producing a "defective computer" and the injuries sustained by Plaintiff has been argued above. These arguments are incorporated herein.

### *Conclusion*

A Motion for Summary Judgment requires the court to review the record in a light most favorable to the non-moving party, the Plaintiff, and interpret any reasonable inference against the moving party, the Defendant. Defendant is not entitled to summary judgment as a matter of law. There are substantial disputes of facts as identified that are material to the issues of negligence, causation and contributory negligence. Based on these disputes and the inference of Defendant's negligence, whether "directly" or under a

res ipsa loquitur claim, Plaintiff requests that Defendant's Motion for Summary Judgment be denied.

          Respectfully submitted,

          _____/s/_____
          Sandra B. Minton, Esquire
          Robert K. Nead, Esquire
          Nead, Minton & Ferris LLP
          305 W. Chesapeake Avenue
          Suite 325
          Towson, MD 21204
          410-337-7704
          410-337-7403 (fax)
          Counsel for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of July 2011, a copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment was electronically filed and forwarded, postage prepaid, via First Class, to:

Christopher R. Dunn, Esquire
1725 Melford Boulevard, Suite 200
Bowie, Maryland 20715
Counsel for Defendant

                                            Respectfully submitted,

                                            _____/s/_____
                                            Sandra B. Minton, Esquire
                                            Robert K. Nead, Esquire
                                            Nead, Minton & Ferris LLP
                                            305 W. Chesapeake Avenue
                                            Suite 325
                                            Towson, MD 21204
                                            410-337-7704
                                            410-337-7403 (fax)
                                            Counsel for Plaintiffs